THE GEORGIA RAILROAD AND BANKING CO. *v.* SMITH.

1. A witness whose testimony, taken by interrogatories, is before the jury in a second trial, cannot be impeached by reading extracts from a brief of his evidence given in at a former trial, without first calling his attention to the brief and affording him an opportunity to explain.
2. There was evidence tending to show that the imputed admission of the plaintiff as to the value of the animal killed was connected with an offer to compromise or settle.

May 12, 1890.

Damages. Railroads. Negligence. Evidence. Witness. Admissions. Before Judge JENKINS. Jones superior court. October adjourned term, 1889.

On December 19, 1886, about half past seven o'clock at night, the plaintiff's mare was killed by defendant's east-going passenger-train, having four coaches. Suit for damages was brought on March 12, 1888, and a verdict was rendered for the plaintiff, and was set aside on motion for a new trial. On the second trial, it appeared that on the next morning after the killing, the plaintiff met the defendant's section-boss, Newsom, and they had some conversation about the matter. Newsom testified that plaintiff said, in response to his inquiry as to what the animal was worth, that she was worth $135 ; that he told plaintiff that if he would be reasonable the road might settle with him, and he said he would be satisfied with $110 ; and that it was the duty of witness to make stock reports, and he did make one in this case. Plaintiff testified that the mare was worth $200 ; and that he did not tell Newsom that she was

worth only $135, but did say that if the company would pay him without any trouble or expense on his part, he would take $110 in full satisfaction for his damages. He had turned the mare into a pasture of eight hundred or a thousand acres, during the day.   The pasture fence enclosed the railroad track; when it crossed the track it was protected by cow-gaps.   The mare got on the track where a path crossed it in a narrow bottom between two hills through which the track runs in cuts. From this path to where she was killed was thirty-five or forty yards.   It was a cold, starlight, windy night. The track was straight for one mile or more back in the direction from which the train was coming.   The engine had a good headlight which would throw a light about 125 yards ahead.   Air-brakes were on the engine, tender and baggage-car; hand-brakes on the other three coaches.   The train was running on schedule-time, about seventeen miles an hour.   When the engineer first saw the mare (and he saw her just before the fireman did), she was about fifty yards ahead, standing across the track at the path-crossing.   Both engineer and fireman had been on the lookout; the track was a heavy down-grade in the direction the train was running.   The engineer did not at first apply brakes, but ran about twenty yards further, after he first saw the mare, before he made effort to stop.   At first glance he could not tell whether it was an animal, or the shadow of a tree or fresh dirt for which she might have been mistaken; but after running the twenty yards, she slightly moved, and thereupon he applied the air-brakes, blew on the hand-brakes and reversed the engine.   He did not do this at first because he did not know whether it was an animal or a shadow; could not tell because it was dark and was so far away in the shadow.   She turned and ran down the track about thirty-five yards in front of the engine into the cut, where she was over-

taken and knocked from the track; the speed of the train having been reduced to about half, and it having taken about forty-five seconds to run the eighty-five yards. Nevertheless the fireman and engineer testified that nothing was left undone to save the mare that could be done; if the brakes had been applied and the engine reversed when she was first seen, it would not have saved her. It takes some time for air-brakes to operate when they are put on, when the speed of the engine would gradually decrease; they act more rapidly than hand-brakes; a train can be stopped more quickly with them; and if they had had them on all the cars, they could have stopped it. A train can be stopped on a level more quickly than on a down-grade.

The jury found for the plaintiff $150, December 10, 1889. The defendant moved for a new trial on the following grounds:

(1) On this trial the engineer of the train testified by interrogatories. From the approved brief of the evidence taken at the former trial, it appeared that he then testified thus: "When I first saw the mare, she was about 90 yards ahead of us, standing on the track. When we were about 70 or 80 yards, she moved. I saw it was an animal. I immediately reversed my engine and put on the air-brakes and tried my best to stop, but it was impossible to do so before we struck, which was in about 35 yards from where I first saw her." On the last trial the plaintiff offered this in rebuttal of defendant's testimony. Defendant objected on the ground that it was offered to impeach the engineer's testimony by interrogatories, and that no proper foundation had been laid, the engineer's attention not having been called to it, or it having been shown that he ever read over the brief and assented to its contents. The overruling of the objection is the error assigned.

(2) Stated in the second part of the opinion.

(3–6) Verdict contrary to law and evidence.

(7) Verdict excessive.

The motion was overruled, and defendant excepted.

HARDEMAN & DAVIS, by brief, for plaintiff in error.

R. L. BERNER and RICHARD JOHNSON, contra.

BLECKLEY, Chief Justice.

1. The action was for killing a mare by the running of a locomotive and train. The only witnesses examined who knew the facts bearing upon diligence were the engineer and fireman. Taking the testimony of these witnesses as true, the exercise of all ordinary and reasonable care would be manifest. The evidence of the engineer was taken by interrogatories. He had testified orally in a previous trial of the case, and a brief of his evidence as then delivered was included in an approved brief of the whole evidence given in at that trial. Extracts from that brief were read on the second trial to impeach his credit and weaken his testimony as taken by interrogatories. This was done without laying any foundation for such impeachment, the objection being that the witness' attention had not been called to the brief, or that the brief was ever read over to him, or that he had assented to its contents. The direct question was ruled in Taylor v. Morgan, 61 Ga. 46, and in Reid v. State, 81 Ga. 760. These cases hold that the impeaching evidence was not admissible. It would have been admissible if the witness' attention had been called to the brief and an opportunity afforded him to explain. Cox v. Prater, 67 Ga. 588. The code, §3872, dispenses with such a preliminary where the statements of the witness are written and have been made under oath in connection with some judicial proceeding. This exception accords with Williams v. Chapman, 7 Ga. 467, and Thomasson v. Driskell, 13 Ga. 258. With the preparation and approval of a brief of evi-

dence the witness has nothing to do. It is not a written statement made under oath by him. Consequently, he is entitled to have his attention called to it before being discredited by its contents. It is said this could not be done, as it was not known previously to the taking of his interrogatories that his evidence on the second trial would vary from the statement of it contained in the brief as given in on the first trial; but this difficulty could be met by suing out interrogatories and therein calling his attention to the discrepancy. The foundation for impeaching a witness may be laid in this way. *Killian* v. *Railroad Co.*, 79 *Ga.* 236. Of course, if necessary, a continuance for this purpose ought to be, and would be, granted.

2. The plaintiff testified at the trial that the mare was worth $200.00. There is evidence that shortly after the animal was killed, he said to one of the employees of the railroad company, in answer to a question by this employee (whose duty it was to make "stock reports"), that she was worth $135.00. Being told that if he would be reasonable the company might settle with him, he said he would be satisfied with $110.00. The plaintiff admitted that he said to this witness, if the company would pay him without any trouble or expense on his part, he would take $110.00 in full satisfaction of his damages, but denied saying that the mare was worth only $135.00. So far as appears, all this evidence was admitted without objection. The court charged the jury that: "Certain statements of plaintiff as to the value of the mare have been admitted in evidence, which were made shortly after she was killed. If these statements were made in an offer of compromise, you are not to consider them in arriving at the value of the mare." The objection to this charge specified in the motion for a new trial, is that there was no evidence to authorize it. It seems to us that

there was evidence going to show that the whole conversation, so far as detailed by the witnesses, had relation to a contemplated settlement, and the terms of it. The charge was, therefore, not amenable to the particular objection specified; but whether the answer of the plaintiff to the question as to the value of the mare, if he made such answer, was evidence as an independent admission within the principle of the authorities on that subject, we need not decide.

A new trial should have been granted for error in admitting the impeaching evidence, for if that evidence had any effect, it was so far prejudicial; and if it had none, the case was well-defended and the verdict should not have been what it was.         *Judgment reversed.*